## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

Jonathan J. Rodriguez Aragones       :
     Plaintiff                       :
                                   :

     v.                                :    Civil Action No.
                                   :

Michael R. Pompeo, Secretary,    :    CA19- 055
Department of State, Agency       :
     Defendant                  :
                                   :
                                   :    Jury Trial Demanded
                                   :

Defendant                                :

## COMPLAINT

## <u>PRELIMINARY STATEMENT</u>

This is an employment-related action for violations of the Plaintiff's civil rights by his federal employer, the US DEPARTMENT OF STATE, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). The employer engaged unlawful employment discrimination and retaliation in violation of Title VII by engaging in retaliatory acts against the Plaintiff for his participation in protected activity. The Plaintiff made a request for accommodation when

The Plaintiff became incapacitated due to a work related spinal injury while his wife and him were in transit to an overseas assignment. The Plaintiff was placed on MED EVAC orders in the Boston Area. Due to the severity of the Plaintiffs condition, Relocation was medically contraindicated. The Plaintiff, at the suggestion of his Assignment O

1

he form of reassignment.   Plaintiff's condition was such that he was incapable of perfor

ming the duties of the position of a Foreign Service Special Agent with the Diplomatic Se

curity Service. From his initial request for assistance, the Plaintiff was the target of false a

ccusations, misrepresentations, negative memoranda, and internal investigations portrayin

g him as an insubordinate disobedient employee.   Further, Plaintiff became the target of

retaliatory and hostile acts when attempted to exercise his rights under Rehabilitation Act

of 1973, as amended, 29 U.S.C. 791 and the Americans with Disabilities Act and when att

empted applied Disability Retirement perpetrated by the very individuals he was required

rely upon for assistance.   Plaintiff became the subject of two removal proceedings which

 were based on false statements and misrepresentations of his condition and failing to obe

y an illegal order.

## JURISDICTION AND VENUE

1.

This action is brought for discrimination in employment pursuant to Title VII of th

e Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gen

der, religion, national origin); Americans with Disabilities Act of 1990, as codified, 42 U.

S.C. §§ 12112 to 12117;

2.

The unlawful employment practices alleged below were committed and/or execute

d by supervisory personnel of the U.S Department of State ("AGENCY").   The claims ar

ise from events which occurred while the Plaintiff lived in Providence, Rhode Island.   A

ccordingly, venue lies in the United States District Court for the State Rhode Island under

 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

3.

The Plaintiff, Jonathan J. Rodriguez-Aragones, is an adult individual who has a mailin

g address of 221 Fountain Street, Framingham, Massachusetts, 01702 , , and is a FS-04 [S

pecial Agent] employed by the US Department of State, Bureau of Diplomatic Security, D

iplomatic Security Service.

4.

The Defendant, Michael R. Pompeo, is the Secretary of the U.S. Department of State, the

agency that employs the Plaintiff at the Diplomatic Security Service and is the named def

endant herein in his official capacity.

## STATEMENT OF FACTS

5.

The Plaintiff had been employed full time by the Department of State for approximately 6

 years and has worked as a Special Agent at all times relevant hereto.

6.

While working as a Special Agent, Plaintiff and his wife departed Washington D.C en rou

3

te to his next assignment US Embassy La Paz in Bolivia.

7.

Due to temperature related travel restrictions the Plaintiff was required could not ship his

dog from Washington D.C, and opted to ship from Boston, Massachusetts.

8.

On or about October 30, 2013, Plaintiff returned to Washington D.C for to ship his Specia

l Protective Equipment.    During this visit Plaintiff was began exhibiting pain in discomf

ort and was seen at George Washington Hospital Emergency Room.    He was released wi

th instructions to follow up with his primary care physician.

9.

On November 5, 2013, Plaintiff was hospitalized due to a painful paralysis of the right leg

   prior to departure to post.    This injury rendered Plaintiff unable to bear weight for or to

sit at all.

10.

November 6, 2013, Plaintiff advised US Embassy La Paz, Assignments Officer Timothy

Dalton (hereafter AO), and Career Development Officer Todd Healy (hereafter CDO) of

his condition.    AO, he advised that since there is no way to guarantee how long recovery

   would actually take, the course of action should be as follows:

   1) Break the assignment

   2) Get a 5/8 waiver due to Medical issues

      3) Assign me to the Boston Field Office (hereafter BFO) as Double Incumbent (DI

      ) or one of the available assignments (there were two at the time).

Plaintiff followed up with my CDO and advised him of the conversation with the AO.

11.

On December 16, 2013, Plaintiff requested that due to my temporary disability and inabili

ty to travel, I requested to be assigned to BFO (they had two assignments available on the

bid list).

12.

On December 17, and after CDO insisting Career Developments and Assignments Office

(hereafter CDA) needed the documents I forwarded the documents provided to the Office

of Medical Service (hereafter MED). MED issued Medical Evacuation Orders for Boston

retroactive to October 30, 2013.

13.

On December 18, 2013, after communicating with RSO Office La Paz, Plaintiff was told

CDA had informed Post that I would arrive within six (6) weeks.   Plaintiff inquired abou

t this from CDO and restated his request to be accommodated.   Plaintiff was informed th

at CDA and the assignments panel had thought that I may get better within six (6) weeks

despite evidence available.   As a result, they were going to wait and see what happened.

14.

Plaintiff contacted CDO advising their belongings were either at post or en route to it had

no winter clothing or a place to live.   Plaintiff stated these conditions would be detrimen

tal to his recovery and create unnecessary hardship to me and my family.   CDO was that

he was the intermediary and the CDA management decided to wait and we would need to

do so.

15.

Plaintiff called AO to discuss the issue, he advised that someone in CDA's and DSs mana

gement had decided to wait despite the information available and that unfortunately there

was nothing that could be done.   The decision was done far above and beyond his head.

  Plaintiff continued to plead his case with CDA through CDO for the remainder of Dece

mber and January and received no response.

16.

On January 15, 2014, Plaintiff poke with CDO regarding my situation and being able to re

sume some duties effective April given certain restrictions.   CDO requested Plaintiff wr

ote a memorandum (email), requesting my assignment to La Paz be broken and Plaintiff b

e reassigned to BFO due to inability to report anywhere else. Plaintiff followed his instruc

tions and sent him the email.

17.

On January 29, 2014, Plaintiff was informed that my assignment was broken and that the

panel had knowingly and willingly assigned me to the DC area regardless of medical restr

ictions and would not issue orders for Plaintiff to return to DC. Plaintiff inquired about th

e available positions in BFO and was told "those assignments were given to someone else

and the panel wants you to get back to DC." Plaintiff stated that Plaintiff was not going t

o disobey medical orders, and could barely walk and needed assistance for most basic nec

essites.   CDO replied he could not override the panel and asked if Plaintiff had sufficient

leave.

18.

In February 14, 2014, Plaintiff provided additional documentation from my Doctors statin

g the need for me to remain in the Boston area.   After speaking with the CDO he stated t

hat he would bring my concerns to the panel and get back to me.   At this time, Plaintiff r

esubmitted hi request for reasonable accommodation assignment to BFO in writing as ne

w positions had became available. Plaintiff further discussed the issue with MED and the

y advised to reach out to Employee Relations for assistance.   At this point all communic

ation stopped from CDA. Plaintiff began addressing the issue of belonging effects with H

RTECH who stated that John Collins would take care of personal effects.   During a telep

hone conversation, HRTECH Mildred Hall stated that no emergency storage of my effects

would be authorized and that Plaintiff would need to receive the effects upon their arriva

l to DC.

19.

On February 28,Plaintiff received broadcasted email stating that my CDO was in training

and would not return until April. Plaintiff reached out to Laurie Darlow, Senior DS Assig

nments Officer, and she advised to direct all communications to Mike Kearns. Plaintiff in

quired the status of my bid to BFO and was told that Plaintiff assigned to DC, "the panel

will wait until you recover and send me overseas". Plaintiff asked about over complement

status at BFO and he stated the panel will not place me at BFO because it is not the way

they normally do it. Plaintiff cited examples of agents who were either double incumbent

or placed as over complement in BFO and other field offices, the financial benefit to assig

n me to BFO, and cited the OPM disability reassignment guidelines. Plaintiff was told by

CDO Kearns the panel chose not to do it that way in this case and "if they cared about cos

ts Plaintiff would have assigned me to BFO to begin with."    CDO Kerns also stated that

the panel may to have someone drive me to DC so Plaintiff can report to work. Plaintiff in

quired about orders and that my belongings would need to be authorized in emergency sto

rage, as my vehicle did. Plaintiff was directed to Human Resources Technician (hereafter

HRTECH).

20.

On February 28, 2014,Plaintiff reached out to Employee Relations to seek assistance.    A

t their direction spoke with Ms. Eliza Bethune-King.    She was surprised CDA had not di

rected me to her office sooner and was concerned as to why this situation had been going

on for so long unaddressed. Plaintiff forwarded her all my documents and she said she wo

uld do some research.

21.

On March 6, 2014, Plaintiff was contacted by Mr. Louis Saddler regarding my request an

d he requested additional documentation. Plaintiff provided all documentation to Mr. Sad

dler, to include a March 14 letter from my physician stating Plaintiff would not be re-eval

uated for another seven (7) months.    The letter also addressed that it was too early to ass

ess permanency and need for surgery.    Surgery would require an additional 6-8 month re

covery.

22.

On March 12, 2014, HRTECH Mildred Hall advised Plaintiff that John Collins would ass

ist with the issue.    Mr. Collins then sent out an email instructing various individuals to u

se the original orders (and thus floating the expense of shipment) to recall the items back t

o DC. Plaintiff reached out to him via email and reiterated the need for emergency storage

until Plaintiff was reassigned, he replied that they would handle it later and hopefully Pla

intiff would recover by then. Plaintiff told him that my treatment was ironed out for the ne

xt 7 months and if Plaintiff needed surgery Plaintiff would need an additional 8 months to

recover.    No response was received.    Plaintiff received an email from CDO Kerns stat

ing that the intent was to maintain status quo and wait until Plaintiff recover to be reassig

ned overseas. Plaintiff discussed this with Louis Saddler who advised his office had not m

ade a determination yet.

23

On March 14, 2014, Plaintiff was informed by MED that based on my most current medic

al information, Plaintiff could return to work but my medical clearance would be downgra

ded to a Class 5- domestic assignment only.

24.

On March 15, 2014,Plaintiff notified Mr. Saddler and CDO Kerns that Plaintiff had been

granted a Class 5 medical clearance.   During a telephone call CDO Kerns advised the B

FO assignment may come to fruition but that Plaintiff need to get approval from Dr. Filso

n's office.   Plaintiff asked why, and was advised Dr. Filson's office needed to make a de

termination to the Director's office regarding Plaintiff Psychological suitability.

25.

On April 8, 2014 conversation, Mr. Collins stated that Plaintiff the old orders were being

used because of budgetary reasons. Plaintiff brought up the issue of storage, he refused to

grant it. Plaintiff reiterated treatment schedule placing me in the Boston area from 7-15 m

onths. He warned that after that time, sick or not, Plaintiff would need to take my items in

 DC or pay out for retail rates for storage.   Plaintiff inquired about travel orders returnin

g to DC to which Mr. Collins then excused himself and hung-up.   Mr. Collins sent an em

ail to the Department's transportation office stating 90 days of storage were authorized gi

ven my overwhelming circumstances.

26.

        In the alternative, the Agency and Bureau of Diplomatic Security has admittedly us

ed a reasonable accommodation process that markedly varied from what is directed in thei

r own policies and procedures.   The process was completely or partially motivated by the

ir intent to penalize him for his lawful, protected conduct in requesting a Reasonable Acc

ommodation through the proper channels once he discovered that the office of CDA had

misrepresented and concealed the procedure to follow.

27.

DARLOW and Management reviewed, and approved the Plaintiff's use of leave, a combi

nation of COMPTIME, ANNUAL, and SICK LEAVE.   The only issue in question was t

hat Plaintiff claimed more hours than he should have (10 hrs of leave versus 8 hrs) which

was corrected by DARLOW.

28.

DARLOW and HR TEC JOHN COLLINS, conferred regarding Plaintiff's situation.   Th

e two of them decided not to issue orders returning the Plaintiff to Washington, DC.   HR

 TEC JOHN COLLINS, COMPLAINTANT was out of pocket for all return expenses de

spite having been in Boston on MEDICAL EVACUATION ORDERS.

29.

KEARNS contacted the Plaintiff under the auspices of a short tour assignment, which wo

uld require Bureau Chief Approval.   Plaintiff asked KEARNS to go directly with Direct

or Moore, since there was a prior EEO case with SA Kimber Davidson.   KEARNS repli

ed "if KIMBER is not onboard this won't happen."   Shortly thereafter, KEARNS and D

ARLOW released Plaintiff's medical documents to DS/EX without permission.

30.

When Plaintiff became aware of CDA's deception under DARLOW and KEARNS, he co

ntacted Disability and Reasonable Accommodations Division (DRAD).    It was then foun

d CDA has never forwarded his requests through the proper channels.    CROCKER beca

me involved and retaliated against the Plaintiff by willfully ignoring the Plaintiff's medic

al restriction of travel.

31.

A data entry error made by the DS/EX time keeper in which the Plaintiff was charged two

types of leave for the same days.    CROCKER refused to correct it stating the error wou

ld not be corrected since she did not think Plaintiff should had been allowed to use his lea

ve.

32.

CROCKER falsely accused the Plaintiff and his Physicians of fraud in April to the Office

of the Inspector General.    As a result, SA Stan Beckton attempted to interrogate Plaintiff

's physicians without a medical release.    The accosting became such that the legal depart

ments of both UMass Medical Center AND Harvard became involved in order to prevent

unauthorized access to my medical information during the interviews.

33.

After meeting with DRAD, CROCKER and KEARNS contacted Plaintiff claiming his re

quest was DENIED, and that DRAD did not have the authority to override them.    Plainti

ff inquired about the denial letter for his reasonable accommodation in order to apply for

Disability Retirement, to which CROCKER threatened the "BUREAU will not allow that

to happen."    CROCKER then referred Plaintiff to OPM to "give it his best shot, but this

will come back to bite you."

34.

CROCKER refused to allow the Plaintiff to use any leave despite supporting medical doc

umentation, and demanded letter to state Plaintiff "could not work at all," which would ha

ve made him ineligible for reasonable accommodation request.    As a result, Plaintiff did

not have any income for the month of May and June.

35

CROCKER's claim of confronting Plaintiff about fraud and getting him to admit to it is a

material misrepresentation of facts.    Being a Law Enforcement Officer, CROCKET wou

ld have had to provide Plaintiff with Garrity Warnings in writing if such event took place.

   Further, this would mean CROCKER was conducting her own investigation outside tha

t of OIG.    Both forbidden practices.

36.

The ROI states that Plaintiff was denied because he failed to participate in the interactive

process.    This an unsupported conclusion and material misrepresentation of facts.    The

decision to place the Plaintiff in overcomplement status was a bureau decision outside the

reasonable accommodation's process.

37.

The agency has provided evidence that show the Bureau of Diplomatic Security, initially

was attempting to grant the Plaintiff's request of accommodation without involving the Di

vision of Reasonable Accommodations and Disability (DRAD).   As the Director MOOR

E inquired about Plaintiff's condition and status, Special Agent Laurie DARLOW from th

e Office of Career Development and Assignments (CDA) OMITS that Plaintiff had order

s issued by the Office of Medical Services (MED) to remain in Boston for medical treatm

ent, which included PERDIEM, HOUSING, EXPENSES, and TRANSPORTATION.   R

ather, she states to DS/EX that "He does not want to go overseas," essentially halting the

process of accommodating the Plaintiff Thereafter all efforts to assist stop, the CDA conti

nues to misrepresent themselves as the responsible party for reasonable accommodation r

equests.   The agency admits that even though Plaintiff made his first request for reasona

ble accommodation in November 2013, CDA did not direct explain the process until APR

IL 2014.   This was three (3) months after the Plaintiff had discovered DRAD was respon

sible for the request.

38.

After successfully obstructing the Plaintiffs request for reasonable accommodation the Ag

ency continued to engage in continuous actual and attempted unlawful discrimination agai

nst him by actions that were designed to intimidate, harass and otherwise penalize the Plai

ntiff.   This included and not limited to issuing and illegal order for him to relocate to Wa

shington DC; Refuse appeal rights for Disability Retirements; Request Removal for Caus

e after Plaintiff became medically unable to fulfill the duties of his Job; false statements t

o EEO investigators; refusal of returning household goods and effects; Deny Plaintiffs rig

ht to appeal a Secondary Removal; relied on statements known to be false during EEOC p

roceedings in order to fractionalize and manipulate the process to the agency's favor.

39.

On or about May 1, 2014, while the Plaintiff was attempting to recover from his injury, he

requested assistance from CDA Crocket and CDO Kearns to apply for Disability Retire

ment.   Their response was "The Bureau will not let that happen." When the Plaintiff rest

ated his request, he was told "that is between you and OPM."   As a result, Plaintiff attem

pted to file for Disability Retirement with OPM.    In June 2015, the Plaintiff was informe

d by DS Executive Director (DS EX) that he needed to apply for disability retirement with

RET (the Department's internal process) and that the Bureau was trying to remove the Pl

aintiff for cause and would not consider a removal on the grounds medical inability to per

form.

40.

On June 16, 2015 Plaintiff applied for Disability Retirement as outlined by 3 FAM 6160 (

See attached).   Plaintiff's claim was denied the Principal Deputy Assistant Secretary HR

/PDAS by citing the restrictive nature of the Foreign Service Act of 1980.   This letter wa

s dated prior to Plaintiff's application.    Explanatory statements were not listed, nor were

there any statements refuting the validity of the evidence presented by    two physicians w

ho provided evidence that Plaintiff is unable, because of disease and injury, to render usef

ul and efficient service as a Federal Law Enforcement Officer.

41.

Reconsideration was requested and new documents were submitted to the attention of the

Director General.    Supporting documentation was presented with language directed to ad

dress the requirements of the Foreign Service Act of 1980.    This reconsideration was N

OT presented to the Director General by RET.    Rather, claim was denied the Principal D

eputy Assistant Secretary HR/PDAS by citing the restrictive nature of the Foreign Service

 Act of 1980 in a letter identical to the initial denial.    The initial denial did not meet the

requirements of 3 FAM 6165 DETERMINATION AND RECONSIDERATION:

42.

The Complainant brought this matter to the attention of RET personnel, its Director, and

HR/PDAS who allegedly authored both denials.    His request for clarification received n

o response and he was never advised about his rights and option of grievance.    The self-s

erving allegation that all procedures were followed is not supported by the facts or docum

entation provided.    As a result, these statements are material misrepresentation of facts

made under oath and should be handled accordingly.

43.

Given the ranking, level of experience, competence of the individuals involved and the ea

se with which these governing regulations can be found, pretext can be inferred.    Further

, the refusal by RET and HR/PDAS to forward the reconsideration request to the Director

General, can only be interpreted as efforts to prevent the claim from going further despite

the Plaintiff meeting all requirements set by law for disability requirement.    Further, Dr.

Ballerino's statement that in the last year, ten (10) other Special Agents have been denied

disability retirement by using the same flawed interpretation of policies should be interpre

ted as discriminatory animus within the organization.

44.

Subjected to a hostile work environment characterized by ignoring all evidence that suppo

rted his inability to report for duty and began removal for cause proceedings.

Through the statements of CDA Kerry Crocket and DS/EX the Plaintiff has been warned t

hat his attempt to seek disability retirement and involvement with EEO Process regarding

his Reasonable Accommodation Request would "Come back to Bite Him."    Further, refu

sal by the Executive Director of the Bureau of discharging the Plaintiff for his medical ina

bility to report to duty and perform his job despite the medical evidence available itself is

a retaliatory act.    Multiple attempts were been made by various members of the Departm

ent to coerce the Plaintiff in to traveling against his medical orders.

45.

Further, refusal to forward the reconsideration request to the Director General denied the

Plaintiff from receiving a proper hearing.    The Complainant was denied the opportunity t

o present exculpatory evidence to the Director General.    Thus ensuring the Bureau's suc

cess attempt to remove the Plaintiff for failing to report, and a secondary removal for poor

 performance.

46.

Plaintiff and his wife has suffered economic losses by the agency's failure to provide an a

ccomodation, including a loss of the increased pay, pension, and benefits that come with t

he position.

47.

Plaintiff has suffered emotional and physical stress because of the unlawful treatment he r

eceived for engaging in protected activity.

48.

The retaliatory conduct of the Employer constitutes unlawful employment discrimination

and specifically violates and related regulations.

## **STATEMENT OF CLAIM**

49.

The discriminatory conduct of which I complain in this action includes but not limited to:

Termination of employment; Failure to accommodate my disability; Unequal terms and

conditions of my employment; Retaliation; Other acts: Refusal to grant Disability

Retirement; Denial of relocation of household goods; Refusal to correct OPF.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

50.

The Plaintiff timely filed for Pre-Complaint Counseling and, thereafter, timely exhausted the requisite administrative remedies before the Equal Employment Opportunity Commiss ion prior to timely filing this action.   A second, related EEOC complaint was filed and, t hereafter, timely exhausted the requisite administrative remedies before the Equal Employ ment Opportunity Commission prior to timely filing this action. A third, related EEOC co mplaint was filed and is before the Agency at this time.

51.

On November 7, 2018, Plaintiff sent an email to OFO inquiring as to the status of the app eal.   On November 8, 2018, Plaintiff was informed the OFO had issued a decision and ri ght sue letter on September 11, 2018. Plaintiff received the decision letter via email on N ovember 8, 2018.

52.

The Plaintiff has performed all conditions precedent, if any, required for the filing and pu rsuit of a claim for judicial relief under Title VII and its related regulations.

## REMEDIES and RELIEF

53.

The Plaintiff is entitled to relief under Title VII for his employer's unlawful discriminator y conduct and retaliation, including but not limited to for the Employer's disparate treatm

ent of the Plaintiff for engaging in protected activities.

54.

Plaintiff respectfully requests that the Court enter judgment in his favor and against the D
efendant and direct the following relief:

- a.    For a money judgment representing compensatory damages, including lost
  wages, damage to credit, professional standing, incurred debts as a result of
  the defendants actions, and all other sums of money, including retirement be
  nefits and other employment benefits, together with interest thereon;

- b.    For a money judgment representing liquidated damages for the Defendants'
  willful violations of Title VII, and any related statutes, regulations and right
  s;

- c.    For a money judgment representing prejudgment interest;

- d.    For an Order directing the Defendant to promote the Plaintiff to the position
  of FS 2, with back pay and benefits;

- e.    In the alternative to the relief requested in preceding subparagraph, for an
  Order directing the Defendant pay the Plaintiff front pay fro those wages he
  would be receiving if he had been properly considered for promotion and p
  rofessional standing to date;

- f.    That the Court retain jurisdiction over this action until the Defendant has full
  y complied with Orders of this Court and that the Court require Defendant t

       o file such reports as may be necessary to supervise such compliance;

g.      For costs of suit, including an award of reasonable attorneys' fees; and

h.      For such other and further relief as may be just and proper.

### JURY DEMAND

55.    The Plaintiff herein hereby demands a trial by jury on all issues in this action.

*WHEREFORE,* the Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendant.

Respectfully Submitted,

Jonathan J. Rodriguez Aragones, Pro Se

Date: 02/1/2019

Plaintiff